**The STATE of Ohio, Appellee,**

v.

**ROBERTS, Appellant.**

[Cite as *State v. Roberts,* 180 Ohio App.3d 216, 2008-Ohio-6827.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–080571.

Decided Dec. 26, 2008.

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Scott Heenan, Assistant Prosecuting Attorney, for appellee.

Robert R. Hastings Jr., and Chris McEvilley, for appellant.

---

CUNNINGHAM, Judge.

{¶ 1} Defendant-appellant Lynn Roberts appeals from the trial court's order denying his motion to dismiss and imposing the remaining portion of his five-year prison term. While his direct appeal was pending in this court, Roberts was selected for placement in an Intensive Program Prison ("IPP")—a 90-day "boot camp" alternative to prison. Roberts completed the program and was released from prison. Thus, he asserts, the trial court lacked jurisdiction to reimpose a term of imprisonment. Because the record does not support Roberts's contention that he was properly selected for an IPP, we affirm.

{¶ 2} This is the third time that this court has reviewed the trial court's imposition of felony sentences against Roberts for heroin trafficking and possession. In September 2007, this court remanded the case to the trial court for it to enter a single conviction under the rule of *State v. Cabrales*, 1st Dist. No. C–050682, 2007-Ohio-857, 2007 WL 624995 ("*Roberts I*").[1] And in June 2008, we denied Roberts's petition for a writ of prohibition seeking to prevent his resentencing ("*Roberts II*").[2] Now, the trial court has rejected Roberts's argument that it lacks jurisdiction to resentence him under our *Roberts I* mandate and has sentenced Roberts to a single prison term for heroin trafficking.

### Roberts I—Remand for Sentencing Under Cabrales

{¶ 3} The factual background of this case was set forth in *Roberts II*. We noted there that "[i]n March 2006, Roberts was indicted in case number B–0602578 for trafficking in heroin within 1,000 feet of a school, in violation of R.C. 2925.03(A)(2), punishable as a third-degree felony, and for possession of heroin, in violation of R.C. 2925.11(A), punishable as a fourth-degree felony. The case was assigned to [the Honorable Ralph E. Winkler, a judge of the Hamilton County Court of Common Pleas] but was ultimately assigned to Visiting Judge Fred Cartolano for trial. Following a jury trial, Roberts was found guilty, and Judge Cartolano sentenced him to a five-year prison term for trafficking in heroin, and to a one-and-one-half-year prison term for possession of heroin. The prison terms were to be served concurrently. Judge Cartolano also informed Roberts

---

1. See *State v. Roberts*, 1st Dist. No. C–060756, 2007-Ohio-4882, 2007 WL 2741480.

2. See *Roberts v. Winkler*, 176 Ohio App.3d 685, 2008-Ohio-2843, 893 N.E.2d 534.

that he would be supervised for a three-year period of postrelease control after leaving prison."[3] The sentencing entry did not contain any statement about Roberts's eligibility for IPP placement.[4]

{¶ 4} "Roberts timely appealed from these convictions in [*Roberts I* ]. Roberts raised four assignments of error contesting the weight and the sufficiency of the evidence adduced to support his convictions and alleging that his convictions were the product of misconduct by the prosecuting attorneys. Oral argument was scheduled for July 31, 2007. On September 21, 2007, this court released its decision overruling each of Roberts's assignments of error, but sua sponte reversing the sentences on the ground that they had improperly been imposed for allied offenses of similar import, in accordance with our decision in *State v. Cabrales*. We remanded the case to the trial court for it to enter a single conviction for either the trafficking offense or the possession offense."[5]

### Roberts's Selection for an Intensive Program Prison

{¶ 5} Within one week of Roberts's September 2006 admission to the Ohio Department of Rehabilitation and Corrections ("the ODRC"), department personnel, including classification specialist Kelly Taynor–Arledge, selected Roberts for an IPP. While his direct appeal in *Roberts I* was pending in this court, Roberts completed the program and was released from prison.

{¶ 6} An IPP is "designed to provide an alternative to traditional incarceration for prisoners who meet" criteria for eligibility established by statute and by regulation.[6] Prisoners in an IPP undergo "a highly structured and regimented daily routine that includes programming and counseling. The program is designed to be a resocialization and learning period, with prisoners expected to participate in physical activity and self-enhancement interventions."[7]

{¶ 7} If a prisoner successfully completes an IPP, the ODRC may reduce the prisoner's stated prison term, or it may release him and place him under postrelease-control supervision.[8] The ODRC may place eligible prisoners in an IPP only if "the sentencing court either recommends the prisoner for placement

---

3. *Roberts II*, ¶ 2.

4. See R.C. 2929.14(K), 2929.19(D), and 5120.032.

5. *Roberts II*, ¶ 3.

6. Ohio Adm.Code 5120–11–02(C); see also R.C. 2929.14(K) and 5120.032(B).

7. Ohio Adm.Code 5120–11–06(A); see also R.C. 5120.032(A).

8. R.C. 5120.032(B)(1)(b); see also R.C. 2929.01(CC) (defining "prison term" as "a stated prison term; [or] a term in a prison shortened by, or with the approval of, the sentencing court pursuant to section * * * 5120.032").

in the intensive program prison * * * or makes no recommendation on placement of the prisoner * * *."[9]  The ODRC may not place a prisoner in an IPP if the sentencing court disapproves the placement.[10]

{¶ 8} The trial court may signal its approval or disapproval of an IPP placement in its sentencing entry or in response to an inquiry from the ODRC.[11] If the court has not made a placement recommendation in its sentencing entry, and the ODRC determines that a prisoner is eligible for an IPP, the department is required to notify the sentencing court at least three weeks prior to admitting the offender to the IPP.[12]  The court then has ten days from the date of notice to disapprove the placement.  If there is no timely response from the court, the prisoner may begin the IPP.[13]

### Roberts II—A Writ of Prohibition

{¶ 9} In October 2007, Judge Winkler ordered the sheriff to return Roberts from the Pickaway Correctional Institution for resentencing pursuant to this court's mandate in *Roberts I*. Roberts had already completed an IPP and had been released from prison.  Judge Winkler nonetheless proceeded to exercise jurisdiction over Roberts for the purpose of resentencing him.  Roberts sought relief in this court by filing for a writ of prohibition to prevent Judge Winkler from resentencing him.

{¶ 10} In *Roberts II*, this court denied Roberts's petition for the writ.  We held that because of defects in the stipulated record presented in that original action, "Roberts ha[d] failed to demonstrate that the trial court is patently and unambiguously without jurisdiction to proceed with resentencing him."[14]  Since the trial court possessed the authority to determine its own jurisdiction, we held that Roberts could raise the issue that, under R.C. 5120.032, Judge Winkler lacked the authority to resentence him at a subsequent sentencing hearing.  And we noted, "[I]f he is returned to prison, he may challenge that ruling in a direct appeal as of right."[15]

---

9.  R.C. 5120.032(B)(1)(a).

10.  See R.C. 5120.032(B)(1)(a);  see also R.C. 2929.14(K).

11.  See R.C. 2929.14(K) and 5120.032(B)(1)(a).

12.  R.C. 5120.032(B)(1)(a).

13.  See id.  ("If the sentencing court does not timely disapprove of the placement, the department may proceed with plans for it.")

14.  *Roberts II* at ¶ 23.

15.  Id.

### The Sentencing Hearing

{¶ 11} Pursuant to this court's remand in *Roberts I*, Judge Winkler proceeded to resentence Roberts. Roberts filed a motion in the trial court to dismiss the resentencing for lack of jurisdiction.

{¶ 12} On July 8, 2008, Judge Winkler held a hearing on Roberts's motion. Taynor–Arledge testified that after Roberts had been found eligible for an IPP placement, she prepared an ODRC Form 2502 "Notice to Sentencing Court of Offender's Recommended Placement into the Intensive Program Prison" for submission to the sentencing judge. This form is referred to as the veto letter since it provided notice that Roberts had been selected for IPP placement and, on a second page, invited the sentencing court to indicate its approval or disapproval of the placement. Since Roberts's sentencing entry had been signed by Judge Cartolano, she prepared to send the veto letter to him. Presumably because Judge Cartolano was a visiting judge, his name was not listed in her directory.

{¶ 13} She contacted the Hamilton County Clerk of Courts by telephone and inquired, "[W]ho do I need to direct this case number to?" An unnamed employee of the clerk's office informed Taynor–Arledge that Judge Frederick Nelson had assumed Judge Cartolano's assigned cases upon Judge Cartolano's retirement. Taynor–Arledge was unaware that Roberts's case had been assigned to Judge Winkler and had reached Judge Cartolano only by assignment as a visiting judge. Despite the fact that Judge Nelson had taken no part in case number B–0602578, Taynor–Arledge transmitted the veto letter to his chambers by fax on September 18, 2006. She also transmitted by fax a copy of the notice, without an approval page, to the Hamilton County Prosecutor's Office.

{¶ 14} Judge Nelson's bailiff, Richard McIntyre, testified that he would occasionally receive misdirected faxes. He would then redirect the fax to the proper judge. He had, however, no recollection of ever receiving Taynor–Arledge's fax concerning Roberts's placement in an IPP.

{¶ 15} ODRC staff attorney James Guy also testified. He had reviewed Roberts's record at the ODRC. Roberts had entered the IPP on April 18, 2007, and had completed the program on July 18, 2007, two weeks before oral argument in his direct appeal in *Roberts I*.

{¶ 16} We note that all parties have accepted as true that Judge Winkler never received notice of the veto letter from the ODRC. This was the unmistakable conclusion to be drawn from Judge Winkler's demeanor, his statements from the bench that *he had not* received notice and that he would not have, in any event, approved an IPP placement, and the court's actions in seeking to resentence Roberts. Judge Winkler stated that "[t]his court, myself, personally never received anything as to the defendant being granted this early release program,

and there's no evidence or information that convinces the court that Judge Cartolano, the judge that I assigned the case to, received the notice either." Since neither party challenged this statement or sought to elicit sworn testimony from Judge Winkler, we consider it established that Judge Winkler did not receive the notice contemplated under R.C. 5120.032 and the administrative code.

{¶ 17} Judge Winkler denied Roberts's motion to dismiss the sentencing proceeding. He then proceeded to conduct a sentencing hearing and to impose sentence on one of the two allied offenses of similar import under this court's mandate in *Roberts I*.[16] Despite undisputed evidence that Roberts had completed the IPP, as well as representations from his counsel that after his release from prison Roberts had been gainfully employed and was living with his grandmother, the trial court dismissed the heroin-possession offense and imposed a five-year sentence on the remaining heroin-trafficking offense. The court also ordered Roberts to receive credit for time already served.

### The Trial Court Had Jurisdiction to Resentence Roberts

{¶ 18} In *Roberts II*, we held that "[a]bsent being barred by the application of R.C. 5120.032, Judge Winkler is clearly authorized to [resentence Roberts]. And an erroneous exercise of that authority can be reviewed on direct appeal."[17] R.C. 2953.08(A)(4) also provides for an appeal as of right from the imposition of criminal sentences that are entered contrary to law. Under R.C. 2953.08(G)(2)(b), we may reverse the sentence imposed only if we find "clearly and convincingly" that the sentence is contrary to law.[18] This court must ensure that the trial court adhered to all applicable rules and statutes in denying Roberts's motion to dismiss and in reimposing a sentence.

{¶ 19} In a single assignment of error, Roberts now argues that Judge Winkler lacked both the authority and the subject-matter jurisdiction to return him to prison, because he had served his sentence, as modified by the ODRC pursuant to R.C. 5120.032, and therefore could not have been resentenced. When a prisoner has already served his prison term, a court lacks the authority to resentence him, even to correct a void sentence.[19]

{¶ 20} The state argues that because the ODRC did not properly place Roberts in an IPP, he did not complete his stated prison term. It claims that the ODRC

---

16. See App.R. 27.

17. *Roberts II* at ¶ 22.

18. See *State v. Sheppard,* 1st. Dist. Nos. C–060042 and C–060066, 2007-Ohio-24, 2007 WL 29440, ¶ 16.

19. See *State v. Bezak,* 114 Ohio St.3d 94, 2007-Ohio-3250, 868 N.E.2d 961, at ¶ 18.

did not send notice to the proper court prior to admitting Roberts to an IPP, as required by statute and administrative regulations. It asserts that the notice should have been sent only to Judge Winkler or to Judge Cartolano, the judges of the common pleas court responsible for imposing the stated prison term, that neither of them received notice, and that the ODRC violated its own regulations in not employing the proper means of providing notice.

### *Which Court Must Approve IPP Placement?*

{¶ 21} Since Roberts bore the burden of going forward on his motion to dismiss, he had the unenviable task of defending the ODRC's actions. On appeal, he first argues that the notice the ODRC sent to Judge Nelson and to the prosecutor's office was sufficient to permit his placement in an IPP: "The Hamilton County Court of Common Pleas, the sentencing court, was notified, but did not respond to the notification."[20] He argues that any judge of the court of common pleas—"the sentencing court"—would have been the proper recipient of the ODRC's veto letter seeking approval or rejection of, or acquiescence in, Roberts's placement in an IPP.

{¶ 22} This argument must fail. The notice that the ODRC provided was not directed to the appropriate court. The notice contemplated under R.C. 5120.032 and Ohio Adm.Code 5120–11–01 et seq. must be delivered either to the court that actually imposed the stated prison term and journalized the sentencing entry or to its duly designated successor court.

{¶ 23} The language employed in the Revised Code and the Ohio Administrative Code to identify the entity empowered to approve or to disapprove a prisoner's eligibility for an IPP and entitled to receive notice of an IPP placement is confusing and inconsistent. That entity is referred to by a hodgepodge of terms: "the court,"[21] "the sentencing court,"[22] "the judge,"[23] and "the sentencing judge."[24]

{¶ 24} For example, R.C. 2929.19(D) and 5120.032 each state that "the sentencing court" shall give or withhold permission for an offender to enter an IPP. And R.C. 5120.032 provides that "the sentencing court" must be notified of a

---

20. Appellant's brief at 7.

21. R.C. 2929.14(K); see also Ohio Adm.Code 5120–11–03(B).

22. R.C. 2929.19(D) and 5120.032.

23. Ohio Adm.Code 5120–11–03(D).

24. See R.C. 2929.01(CC); see also Ohio Adm.Code 5120–11–03(D).

prisoner's proposed placement in an IPP.[25] While the term "sentencing court" is not explicitly defined in the Revised Code, R.C. 2929.11(A), which identifies the purposes of felony sentencing, equates the "court that sentences an offender for a felony" with "the sentencing court."

{¶ 25} Other code sections and administrative rules maintain that "the court," in its sentencing entry, "expresses disapproval * * * approval * * * or [remains] silent regarding [a prisoner's] placement" in an IPP.[26] R.C. 2929.14(K) also provides that "[a]t the time of sentencing, the court may recommend the offender for" IPP placement, may "disapprove placement," or may "make no recommendation."

{¶ 26} Still other portions of the administrative code dictate that the "sentencing judge" may "disapprove [or] approve intensive program prison for the prisoner."[27] Ohio Adm.Code 5120–11–03(G) provides that "[i]f the prisoner meets the eligibility criteria * * * of this rule * * * and, if applicable, the sentencing judge has not disapproved intensive program prison, the director shall review all relevant information * * * and approve or disapprove the prisoner's placement in the program." And the Revised Code provides for the stated prison term to be "shortened by, or with the approval of, the sentencing court pursuant to section * * * 5120.032."[28]

{¶ 27} But there is one constant in each of the various statutes and regulations. No matter how they identify the court empowered to approve or disapprove IPP placement, by whatever name the court is described, it is clear that the General Assembly intended to have the court that imposed the stated prison term and journalized the sentencing entry receive the veto letter and decide whether to permit an otherwise eligible prisoner to participate in an IPP.

{¶ 28} R.C. 2929.19 identifies the "sentencing court" as the entity that determines, at the sentencing hearing, whether a prison term is necessary or required, that imposes a stated prison term, that notifies the offender of postrelease control, that journalizes the sentencing entry, and that approves or disapproves placement by "mak[ing] a finding that gives its reasons for its recommendation or disapproval."[29] Each of these functions is accomplished by a single judge, or by a

25. R.C. 5120.032(B)(1)(a).

26. Ohio Adm.Code 5120–11–03(B).

27. Ohio Adm.Code 5120–11–03(D).

28. R.C. 2929.01(CC).

29. R.C. 2929.19(D); see also *State v. Jackson*, 5th Dist. Nos. 05 CA 46 and 05 CA 47, 2006-Ohio-3994, 2006 WL 2205651 (where a trial court did not make express findings, a review of

judge working with a visiting judge, and not by the common pleas court at large. Since only one judge of the common pleas court is acting "[a]t the time of sentencing"[30] to impose a stated prison term and to approve or disapprove placement, only one judge of the court is the proper recipient of the veto letter.

{¶ 29} The administrative code also tracks this interpretation. Ohio Adm.Code 5120–11–03(D) states that if a prisoner's "sentencing entry is silent" on placement in an IPP, the ODRC shall notify "the sentencing judge" of its intention to place the applicant in such a prison. The sentencing judge has ten days after receiving notice to grant or withhold approval.[31] The next sentence of the regulation employs the term "sentencing court," but only to identify the sentencing court as the court that prepared the entry and stated its intention vis-a-vis IPP placement in its sentencing entry: "This notification process does not apply if the sentencing court finds statutory eligibility for the prisoner's placement in an intensive program prison and/or the sentencing entry either approves or recommends such placement."[32]

{¶ 30} Thus we hold that, under R.C. 5120.032, if a prisoner's sentencing entry is silent on IPP placement, the ODRC must provide notice or seek approval from the court that imposed the stated prison term and journalized the entry, or from its duly designated successor court. Roberts, forced to defend policies and procedures that he had no part in creating or carrying out, nonetheless did not demonstrate that the ODRC had provided notice to the court that had imposed his stated prison term and journalized his sentencing entry before his selection for placement in an IPP. The only evidence of record is that Taynor–Arledge sent notice to Judge Nelson and not to the proper sentencing judges.

{¶ 31} As Judge Painter noted in his separate concurring opinion in *Roberts II*, "retirements, substitutions, and visiting judges are all in the mix."[33] And perhaps both the ODRC and the common pleas court should develop policies to avoid and to remedy misdirected notices. But when the ODRC acts to reduce the prison term of a convicted felon, it must act in conformity with the controlling statutes and its own regulatory scheme. It must provide notice to the court that imposed that prison term.

---

the record as a whole, including the trial court's remarks at sentencing, was sufficient to meet the requirements of R.C. 2929.19[D] ).

30. R.C. 2929.14(K).

31. Ohio Adm.Code 5120–11–03(D).

32. Id.; see also Ohio Adm.Code 5120–11–03(B).

33. *Roberts II* at ¶ 26.

### *ODRC Did Not Employ the Proper Means for Providing Notice*

{¶ 32} Administrative rules and procedures enacted pursuant to a specific grant of legislative authority have the force and effect of law.[34]  Pursuant to R.C. 119.03 and 5120.032(A), the director of the ODRC was authorized to "develop and implement intensive program prisons for male and female prisoners."[35]  Therefore, in selecting and placing Roberts in an IPP, the ODRC was required to comply not only with the statutory requirements but also with its own rules and regulations.

{¶ 33} While R.C. 5120.032 requires simply that the ODRC "notify" the sentencing court of its proposed placement of a prisoner in an IPP, Ohio Adm.Code 5120–11–03(D) identifies the proper means of providing that notice.  It states that if a prisoner is eligible for an IPP and, as here, the sentencing entry is silent on the prisoner's placement, ODRC "shall notify, *by certified or electronic mail*, the sentencing judge of its intention to place the applicant in an intensive program prison."[36]  That section of the administrative code also requires the judge to notify the ODRC of his or her approval or disapproval "within ten days after *the mail receipt*."[37]

{¶ 34} While the communication sent to Judge Nelson bore the statement that it had been sent "Certified Mail Return Receipt Requested," Taynor–Arledge actually had sent the veto letter by fax transmission and not by electronic mail or by certified mail.  Taynor–Arledge testified that the ODRC had sent veto letters by fax in the past, but that the ODRC now sent them by certified mail, return receipt requested.  With that method, she stated, "you know who got the form." That was not the case here.

{¶ 35} The ODRC is also required to provide other notices beyond the veto letter.  It must notify the sentencing court, *in writing*, when a "prisoner is accepted * * * to participate in the program,"[38] when a "prisoner is released to intermediate transitional detention or, if applicable, post-release control,"[39] and when the prisoner successfully completes "the ninety-day imprisonment phase of

---

34. *Doyle v. Ohio Bur. of Motor Vehicles* (1990), 51 Ohio St.3d 46, 554 N.E.2d 97, paragraph one of the syllabus; see also *Uddin v. Embassy Suites Hotel*, 113 Ohio St.3d 1249, 2007-Ohio-1791, 864 N.E.2d 638, ¶ 13.

35. R.C. 5120.032(A).

36. (Emphasis added.)  Ohio Adm.Code 5120–11–03(D)

37. (Emphasis added.)  Id.

38. (Emphasis added.)  Ohio Adm.Code 5120–11–21(B).

39. Ohio Adm.Code 5120–11–21(C).

the program."[40]  The ODRC is required to notify the sentencing court, again *in writing,* of the prisoner's "expected parole release date or, if applicable, the duration of post-release control sanction"[41] and of the issuance of "a certificate of expiration of the stated prison term;  a certificate of expiration of definite sentence;  or a certificate of final release."[42]  ODRC staff attorney James Guy found only the veto letter sent by Taynor–Arledge in Roberts's prison records.

{¶ 36} Requiring the ODRC to send multiple notices to the sentencing court reflects the General Assembly's policy of entrusting the duty of felony sentencing to the trial courts in the first instance.  A sentencing court is to be guided by the overriding purposes of felony sentencing: "to protect the public from future crime by the offender and others and to punish the offender.  To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both."[43]

{¶ 37} The trial court's duty of supervising felony sentencing does not end with the imposition of a stated prison term.  Both shock incarceration under R.C. 5120.031 and an IPP under R.C. 5120.032 allocate an important role to the trial court even after an offender has begun his stated prison term.  The ODRC's IPP screening procedures and its communications about an offender's progress in the program yield essential details of an offender's progress toward rehabilitation— information that a sentencing court could use to expedite or to limit the early termination of the stated prison term.

### Conclusion

{¶ 38} Roberts did not demonstrate that the ODRC had provided notice to the court that imposed his stated prison term and journalized his sentencing entry before his selection for placement in an IPP. He also did not demonstrate that the ODRC had employed the proper means to provide the initial placement notice and the subsequent notices required by regulation.

{¶ 39} The state argues that the procedures employed by the ODRC pursuant to statute and the administrative code violated the separation-of-powers doctrine by conferring judicial power on an executive agency.  It also notes that Roberts remained on postrelease control at the time Judge Winkler attempted to resen-

---

40.  Id.

41.  (Emphasis added.)  Id.

42.  Ohio Adm.Code 5120–11–21(D).

43.  R.C. 2929.11(A).

tence him. Since postrelease control was part of Roberts's sentence, the state argues that Roberts had not served his entire prison sentence and that the trial court retained jurisdiction over him.

{¶ 40} Ohio law states clearly, however, "that constitutional issues should not be decided unless absolutely necessary."[44] Since we have held that the ODRC failed to comply with its own regulations and thus did not properly place Roberts in an IPP, we reiterate the long-standing principle that a court will not determine constitutional claims that are not essential to the disposition of a particular controversy.[45]

{¶ 41} Because we do not conclude that the trial court's denial of Roberts's motion to dismiss and its subsequent exercise of jurisdiction and imposition of sentence were contrary to law, we overrule the assignment of error.

{¶ 42} The trial court's judgment is affirmed.

Judgment affirmed.

SUNDERMANN, P.J., concurs.

PAINTER, J., dissents.

PAINTER, Judge, dissenting.

{¶ 43} This is a case of a promise broken—by the government. The majority's result is absurd. All the legal mumbo jumbo is well and good—but they are looking at the case backwards.

{¶ 44} Let us look at the case from a real person's viewpoint. Roberts was sentenced for a crime. He went to prison. Prison officials deemed him eligible for a special program. The program provided that, if you do well and complete the program, you will be released early. Roberts successfully completed the program, was released, was employed, and got into no more trouble. The program, designed to save prison space for violent offenders, worked.

{¶ 45} Then Roberts was jerked off the street and back into prison. Why? Because a clerk faxed a paper to the wrong number—though the paper may in fact have reached the right place. And judges had retired, visited, and switched, so the error, if there was one, was understandable.

{¶ 46} Roberts had done exactly what the system asked of him. But evidently it was not enough.

---

44. *Hall China Co. v. Pub. Util. Comm.* (1977), 50 Ohio St.2d 206, 210, 4 O.O.3d 390, 364 N.E.2d 852.

45. See id.; see also *State v. Meyer* (1988), 61 Ohio App.3d 673, 676, 573 N.E.2d 1098.

*Mumbo v. Jumbo*

{¶ 47} In the majority's dissection of what the legislature pleases to call the "Revised" Code, the terms *judge, court,* and *sentencing court* —described by the majority as "a hodgepodge of terms"—are interpreted. Of course, they shouldn't have to be. The law should be clear, not require dozens of paragraphs to technically reach an unfair result.

{¶ 48} Because Roberts had served his prison term, the trial court lacked the authority to resentence him.[46] But the state argues that if the ODRC did not properly place Roberts in an IPP, he did not complete his stated prison term. Of course, the ODRC sent notice, but because of the mix-up with judges, it may not have arrived on the desk of the judge who was being filled in for by the retired, but then visiting, judge. We learn from the majority that because of this minor glitch, Roberts—who was already released after successfully completing the program—must serve four more years. The "system" has broken its promise to him.

### *Shouldn't the Government Keep its Promises?*

{¶ 49} The common law long ago developed a doctrine to deal with the situation we have here. "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."[47] It is called promissory estoppel. The law developed to prevent the double-cross. And this double-cross was performed by the government.

{¶ 50} The state is one actor, whether it acts through the judge, the ODRC, or the prosecution. Roberts had been made a promise—early release—and he relied upon that promise in entering and completing the intensive program. The state should not be heard to deny its promise because of a minor paperwork glitch. Yes, I know that some courts hold that promissory estoppel cannot usually be applied against the state[48]—another vestige of the original error in importing sovereign immunity to American shores.[49] But in this case, equity should prevail.

---

46. See *State v. Bezak,* 114 Ohio St.3d 94, 2007-Ohio-3250, 868 N.E.2d 961, at ¶ 18.

47. Restatement of the Law 2d, Contracts (1981), Section 90.

48. *Sun Refining & Marketing Co. v. Brennan* (1987), 31 Ohio St.3d 306, 307, 31 OBR 584, 511 N.E.2d 112.

49. *Garrett v. Sandusky* (1994), 68 Ohio St.3d 139, 144, 624 N.E.2d 704 (Pfeifer, J., concurring).

*Last Chance*

{¶ 51} Of course, one chance to stop this outrage fell to the trial court. The better part of discretion would have been simply to approve the placement—since it had clearly worked. But after reading the transcript of the hearing, one is left with the impression that the trial court considered the placement a personal insult in need of redress.

{¶ 52} Of course, the last clear chance to derail this railroading fell to this court. And the majority waved the train on—the train must be on technically the wrong track even if it is to crash.

{¶ 53} So Roberts sits in prison, at great expense to the taxpayers, rather than working and contributing to society. The system has lied to him and double-crossed him. And the majority examines the technicalities for 15 pages and finds that the double-cross is legal.

{¶ 54} I, for one, am ashamed of a system that would allow this result.